Argued and submitted July 28, reversed on petition; reversed and remanded for reconsideration on cross-petition November 19, 1997

## OREGON OCCUPATIONAL SAFETY & HEALTH DIVISION,
### *Respondent - Cross-Petitioner,*

*v.*

## ROSEBURG LUMBER CO.,
### *Petitioner - Cross-Respondent.*

### (SH-93175; CA A94188)

949 P2d 307

Adam T. Stamper argued the cause and filed the briefs for petitioner - cross-respondent.

Jas. Adams, Assistant Attorney General, argued the cause for respondent - cross-petitioner. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

RIGGS, P. J.

### RIGGS, P. J.

Roseburg Lumber Co. (Roseburg) seeks review of an order of an administrative law judge (ALJ) of the Workers' Compensation Board affirming one of several citations and penalties imposed by the Oregon Occupational Safety and Health Division (OR-OSHA), assigning various errors. OR-OSHA cross-petitions, assigning error to the ALJ's dismissal of one of the citations. We review the ALJ's order for substantial evidence to support the findings and for errors of law. ORS 183.482; ORS 654.290(2). We reverse the order on the petition and reverse and remand the order to the ALJ for reconsideration on the cross-petition.

Roseburg is a timber products business that manufactures dimensional timber. In the industry, there are times when machinery must be turned off for maintenance or so that other work can be done, in circumstances where it would be dangerous if the machinery unexpectedly begins to function. To eliminate the risk of accidental start up, the general rule in the industry is that the machinery must be isolated from its power source, rendering it incapable of operation, while one or more employees are in the zone of danger. Even with power disconnected, there is still the risk that the machine or circuit might be accidentally activated, due to stored-up energy or power that remains in the system. To avoid accidental activation, the industry has developed a general safety rule known as "lockout/tagout," which provides that the worker who has disconnected the power and is the one exposed to potential hazard in the event of accidental operation must "tag" the power source so that no other employee will accidentally activate the machine and injure the employee who is in the danger zone. A worker may put a padlock on the power source and retain the key so that no other employee can inadvertently activate the machine.

In November 1992, OR-OSHA's policy with regard to the removal of a lockout device was set forth in OAR 437-02-140 (1992), which adopts by reference the federal regulation governing the removal of lockout/tagout devices. 29 CFR 1910.147(e)(3) states the "basic rule" of lock removal:

"Each lockout or tagout device shall be removed from each energy isolating device by the employee who applied the device."

The rule contains an exception:

"When the authorized employee who applied the lockout or tagout device is not available to remove it, that device may be removed under the direction of the employer, provided that specific procedures and training for such removal have been developed, documented, and incorporated into the employer's energy control program. The employer shall demonstrate that the specific procedure provides equivalent safety to the removal of the device by the authorized employee who applied it."

Because Oregon has adopted the federal rule governing lockout/tagout procedures, the federal purpose in adopting 29 CFR 1910.147(e)(3) is relevant to assist us in discerning Oregon's purpose. *Oregon Occupational Safety v. PGE*, 119 Or App 17, 21, 849 P2d 544 (1993). In the preamble to the publication of 29 CFR 1910.147, OSHA states:

"In paragraph (e)(3) of this Final Rule, OSHA is requiring that as a general rule, the authorized employee who affixes the lockout or tagout device is the only one allowed to remove it. OSHA believes that each such employee must have the assurance that the device is in his/her control, and that it will not be removed by anyone else except in an emergency situation. The entire energy control program in this standard depends upon each employee recognizing and respecting another employee's lockout or tagout device. The servicing employee relies upon the fact that he/she applied the device, and assumes that it will remain on the equipment while he/she is exposed to the hazards of the servicing operation. OSHA can envision very few instances which would justify one employee's removal of another's lockout/ tagout device. However, in a true emergency, and not merely because the employee is not available, the employer may be able to demonstrate a need to remove an employee's lockout/tagout device. An exception to paragraph (e)(3) of the final rule is being provided to allow for such situations * * *. OSHA emphasizes that removal of a personal lockout or tagout device by another person may not be based on convenience or simple unavailability of the employee. If a lockout/tagout device is attached it is assumed that the employee who attached the device is engaged in servicing

the equipment to which the device is attached, and that person is exposed to the hazards of reenergization. Therefore, as a general matter the protection of that employee requires that he/she have complete control over his/her lockout or tagout device. * * *

"Under the exception to paragraph (e)(3), *the employer may direct the removal of a lockout / tagout device by another employee only if the energy control program contains specific procedures and training for that purpose, and only where the employer can demonstrate that the alternative procedure will provide equivalent safety to having the employee remove his / her own device.* The procedure must include, at a minimum, the following items: First, verification that the authorized employee is not at the facility; second, making all reasonable efforts to contact that employee to inform him/her that his/her device has been removed; and third, ensuring that employee knows of that device removal before he/she assumes work at the facility." 54 Fed Reg 36680 (September 1, 1989) (emphasis supplied).

Under both the federal regulation and the Oregon administrative rule, a lock placed on a machine by one employee may be removed by another employee, under the direction of the employer, only if the employer has provided training with regard to the removal of such devices that provides equivalent safety to having the employee remove his or her own device.

The ALJ made these findings, which we conclude are supported by substantial evidence: At the relevant time, Roseburg had a written policy that a lockout device installed by one person could be removed by another in the first person's absence only if no fewer than two supervisors or foremen ("yellow hats") or the shift electrician were called to the site of the lock to inspect and ensure that removal of the lock would not endanger employee safety.

Roseburg's Sawmill No. 1, in Dillard, Oregon, produces dimensional lumber. Logs enter the building at the beginning of the process and are sawn into rough-cut boards. The boards then go through a planer and then to trim saws to be cut into appropriate lengths. At Sawmill No. 1, certain employees regularly turn off machinery to work on it or clean

in and around it. All employees who have the authority to turn off machinery have assigned locks bearing their names.

Kenneth Anderson is foreman on the day shift of the planer section in the "dry end" of Sawmill No. 1. He supervises 30 to 40 of the 144 employees in that portion of the mill. He has participated in several safety training sessions regarding "lockout/tagout" procedures and also has taught courses to employees regarding that process.

On the evening of December 15, 1992, Donald Hardage worked the night shift as a millwright. His responsibilities included changing the saws at the end of his shift so that sharp saws would be on line at the beginning of the next shift. At the end of the night shift, Hardage locked out the power on the trim saws and changed the saws. He used a new lock that was not identified with his name. When he completed his task, he inadvertently left his padlock on the power source and left the mill to go home, leaving the trim saws without power.

When Anderson began his shift shortly before 6:00 a.m. on December 16, 1992, he was told by a member of his crew, Stanton, that there was a lock on the 26-foot trim saw control panel. Anderson and Stanton walked to the trim saw control panel and on the way, the ALJ found, Anderson could see that there were no raised saw covers or any people in the danger zone. When he reached the electrical control panel, Anderson asked Stanton to call for a millwright. While Stanton was gone for a brief period, Anderson continued to inspect the area around the machinery and saw that no employees were in the danger zone. Anderson did not know whose lock was on the trim saw control panel because it had no name on it, but he supposed that the lock had been left on inadvertently by Hardage. He used a metal bar to pry off the lock. When Stanton returned, the lock had been removed, and Anderson was starting the trim saw. The millwright had not yet arrived. Only Anderson and employee Vic Burns witnessed the entire incident.

Later that morning, Anderson told superintendent Cox of the incident with the lock and explained that he had individually inspected the machine before removing the lock. Cox admonished Anderson and instructed him that he was

not to remove a lock without two supervisors present. Anderson felt that he had been thoroughly reinstructed and that he clearly understood Roseburg's policy.

On December 28, 1992, in response to an anonymous complaint, an OR-OSHA Safety Compliance Officer (SCO) came to the mill to investigate the lock removal incident. As a result of the inspection, the SCO issued several citations, all arising out of the lock removal incident:

Item 1-1A: Violation of OAR 437-02-140 29, CFR 1910.147(e)(2)(I), by failing to ensure that all employees had been positioned safely or moved from the work area before lockout or tagout devices were removed. OR-OSHA assessed a penalty of $3,500.

Item 1-1B: Violation of OAR 437-02-140 29, CFR 1910.147(e)(1), by failing to inspect the work area to ensure that nonessential items had been removed and that machine or equipment components were operationally intact before lockout or tagout devices were removed and energy was restored to the machine. OR-OSHA assessed a penalty of $3,500.

Item 1-2: Violation of OAR 437-02-140 29, CFR 1910.147(c)(5)(ii)(D), by using a lockout/tagout device that did not indicate the identity of the employee applying the device. OR-OSHA assessed a penalty of $210. Employer concedes that this citation and the related penalty are appropriate.

Item 2-3: Violation of OAR 437-02-140 29, CFR 1910.147(e)(3), by failing to have a lockout/tagout device removed by the person who had applied it. OR-OSHA assessed a penalty of $50,000.

Item 2-4: Violation of OAR 437-40-030(1), which requires that "workers are properly supervised in the safe operation of any machinery, tools, equipment, process or practice which they were authorized to use or apply." OR-OSHA assessed a $50,000 penalty for that violation.

The ALJ found that Anderson had completed a safe and adequate inspection of machinery before removing the lockout device, and the ALJ therefore dismissed Items 1-1A

and 1-1B, which were based on the allegedly inadequate inspection.

Roseburg raised several challenges to the citations and to evidence sought to be introduced by OR-OSHA to establish citation Items 2-3 and 2-4. The ALJ held that OR-OSHA could put on evidence of Roseburg's lockout device removal policy as it related to those citations. He ruled, however, that he would not consider OR-OSHA's assertion that Roseburg's policy was inadequate, because no citation had asserted a defect in Roseburg's policy.

With regard to citation Item 2-3, the ALJ held that having an energy control training program so as to permit an employee to remove a third person's lock is an affirmative defense to the citation for violation of the "basic rule" of lock removal by the person who placed the lock and that it did not need to be established by OR-OSHA in proof of the citation. He found that Roseburg had in existence an adequate safety training program with regard to the removal of lockout devices and held that *the existence of the safety program* was sufficient to satisfy the requirement of the administrative rule. He held, therefore, that Anderson's removal of the lock had not violated OAR 437-02-140 29, CFR 1910.147(e)(3). Accordingly, he dismissed Item 2-3. In its cross-petition, OR-OSHA challenges that dismissal.

■■ In Item 2-3, OR-OSHA charged a violation of OAR 437-02-140 29, CFR 1910.147(e)(3), which, for convenience, we quote again here:

> "Each lockout or tagout device shall be removed from each energy isolating device by the employee who applied the device. Exception to paragraph (e)(3): When the authorized employee who applied the lockout or tagout device is not available to remove it, that device may be *removed under the direction of the employer*, provided that specific procedures and training for such removal have been developed, documented, and incorporated into the employer's energy control program." (Emphasis supplied.)

In its cross-petition, OR-OSHA argues:

> "The mistake made by the Board with respect to Citation Item 2-3 is to assume that the exception in subsection (e)(3) can be *facially* established by showing that the

employer has a specific alternative procedure for lock removal that is equivalent to the basic rule, without ascertaining whether the employer's specific policy actually had been followed in the particular instance." (Emphasis OR-OSHA's.)

The exception, OR-OSHA asserts, must be established by evidence showing not only that the employer had a procedure for lock removal, *but that the procedure was followed in the particular instance*. We agree with OR-OSHA. The rule focuses on the act of removing a third person's lock and generally prohibits it, unless the device is removed *under the direction of the employer* and, we conclude, *pursuant to* a specific procedure designed to ensure equivalent safety. We conclude that it is not enough under the exception to merely have a procedure designed to ensure equivalent safety. The lock must be removed in compliance with that procedure or the removal is a violation of 29 CFR § 1910.147(e)(3). Here, it is undisputed that Anderson's removal of the lock was not in compliance with company policy requiring the presence of no less than two supervisory personnel. Thus, we conclude that the ALJ erred in dismissing Item 2-3.

■ Roseburg raised several challenges with regard to Item 2-4. That citation paraphrased OAR 437-40-030 and charged that

"[t]he employer did not see that workers were properly supervised in the safe operation of any machine, tools, equipment, process, or practice which they were authorized to use or apply as evidenced by:

"(a) On or about December 16, 1992, a shift supervisor/ foreman broke a lockout device off of the trim saws, in violation of written company policy and applicable state laws. *No disciplinary action or other measures were taken* by the employer prior to December 28, 1992, to assure there would be no recurrence of the incident * * *[.]" (Emphasis supplied.)

Roseburg challenged the citation on the ground that the alleged factual predicate, a failure to discipline, is not a violation in and of itself and cannot support the charged violation of a failure to properly supervise. Although the ALJ held that as a matter of law a failure to discipline Anderson would

not support the citation or any other citation, he found, none-theless, that Anderson had been disciplined appropriately. That finding is supported by substantial evidence. Accordingly, we do not consider whether establishing a failure to discipline would support the citation.

Roseburg asserts that the failure to discipline Anderson was the only factual allegation in support of Item 2-4 and that, in the light of the ALJ's finding that discipline of Anderson was adequate, the citation fails. At the hearing and now on review, OR-OSHA asserted that Anderson's violation of company policy and the administrative rule regarding lockout/tagout procedures show a lack of supervision of Anderson and also support the citation. The ALJ ruled that, in addition to evidence concerning the discipline of Anderson, evidence concerning Roseburg's *supervision* of Anderson would be admissible to prove the violation. Consistent with his conclusion with regard to Item 2-3, the ALJ held that Anderson had not violated state law and that that factual assertion did not support the citation. He found, however, that Anderson had willfully violated company policy concerning the removal of lockout devices and on that ground upheld the citation alleging inadequate supervision. As we have held, the ALJ erred in concluding that Roseburg had not violated OAR 437-02-140 29, CFR 1910.147(e)(3). Accordingly, we consider also whether Anderson's violation of state law and company policy can, as a matter of law, establish citation Item 2-4.

Roseburg challenges the legal sufficiency of Item 2-4 on the ground that, if shown to be true, Anderson's alleged violations of law and company policy are unrelated to whether Roseburg adequately *supervised* Anderson. In affirming the citation, the ALJ found:

"As of the date of the incident, the employer had an ongoing safety training program which included frequent training in lockout/tagout procedures. Foreman Anderson attended many of the sessions, and even taught some. He also informally instructed the employees he supervised in the same procedure. Foreman Anderson knew, or should have known, that the policy required, as a minimum, that two 'yellow hats', meaning supervisory and/or technically trained personnel, assist in inspecting the premises to

ensure worker safety before a third person's lock could be removed. *Though his flamboyant disregard for that policy did not endanger any workers because he did conduct an adequate inspection, that same flamboyant conduct significantly ignored the key element of the employer's plan for removing third party locks. I conclude that foreman Anderson was merely a foreman who was overly conscious of the 'bottom line' and thought it was more important to get the mill up and running than it was to follow the specific terms of the company safety policy."* (Emphasis supplied.)

The emphasized language is the only pertinent discussion of Item 2-4. We agree with Roseburg that the ALJ's cited reasons for affirming the citation do not relate to the charge of inadequate *supervision of Anderson,* to which OR-OSHA was limited at hearing. They relate, rather, to whether Anderson's conduct was a willful violation of company policy, the circumstances of which are encompassed within Item 2-3. The only findings bearing on the question of Roseburg's *supervision* of Anderson, *i.e.,* through training and reinstruction, would support a finding that he was adequately supervised, and not the reverse. Accordingly, we conclude that the ALJ's findings do not support citation Item 2-4 and the related penalty.[1]

A question remains concerning the disposition of the penalty assessed by OR-OSHA on Item 2-3. Item 2-3 was charged as a "willful" violation. Because the ALJ dismissed the citation, he did not consider separately whether the violation was willful so as to support the enhanced $50,000 penalty. On remand, the only issue remaining before the ALJ is the disposition of the enhanced penalty.[2]

---

[1] In view of our disposition of this assignment, we do not consider employee's contention that the citation should be dismissed because it does not charge Roseburg under the narrowest applicable standard.

[2] In view of our conclusion that Item 2-4 should be dismissed, we do not address employer's argument that OR-OSHA improperly issued more than one citation for a single "state of facts." ORS 654.025(3)(c) requires that

"[i]n the event a state of facts or conditions constitutes a violation of more than one rule, regulation, standard or order of the director or any other agency pertaining to occupational safety or health, the state of facts or condition shall be the basis for the issuance of only one citation and proceeding or the assessment of only one penalty unless the statute specifically provides that a continuation of a state of facts or a condition constitutes a new violation."

■ Because the issue may arise on remand, we consider here Roseburg's legal challenges to the imposition of the enhanced penalties. Roseburg alleges that both assessed penalties are invalid, because, contrary to the requirements of OAR 437-01-175, which provides that in the context of a willful violation *the Administrator* may assess a penalty, here, the *Deputy Administrator* assessed the penalties. We agree with the ALJ's conclusion that the Administrator could delegate responsibility for assessing a penalty to the Deputy Administrator. At the relevant time, OAR 437-01-020 provided that "the Administrator is hereby granted the authority to do whatever is reasonably necessary or incidental to accomplish the purposes of this Act and these rules."

■ Roseburg contended, further, that in affirming the assessment of the enhanced penalty under Item 2-4, the ALJ applied an incorrect standard of "willfulness," as used in OAR 437-010-015(53)(b). Because the contention likely will arise on remand with regard to the enhanced penalty assessed on Item 2-3, we address it.

The ALJ correctly stated that Oregon law adopts the definition of "willful violation" that has developed in the federal case law. *Oregon Occupational Safety*, 119 Or App at 22. OAR 437-010-015(53)(b) defines a willful violation as

> "a violation that is committed knowingly by an employer or supervisory employee who, having a free will or choice, intentionally or knowingly disobeys or recklessly disregards the requirements of a statute, regulation, rule, standard or other."

Under federal law, to show willfulness, OSHA must put forth affirmative objective evidence of a specific, overt and intentional act, not mere carelessness or lack of diligence. Roseburg contends that the ALJ applied a more lenient, "wholly subjective and discretionary" test of willfulness. Contrary to Roseburg's contentions, we conclude that the ALJ applied the majority federal rule, which defines a willful violation as the intentional disregard of, or plain indifference to, OSHA requirements, *Cedar Construction Company v. Occupational Safety and Health*, 587 F2d 1303, 1305 (DC Cir 1978), and that the evidence supports the ALJ's findings that Anderson acted in deliberate disregard of Roseburg's policy, of which he

was aware.[3] On remand, the ALJ shall consider, in the light of our holdings, whether the enhanced penalty assessed by OR-OSHA on Item 2-3 should be upheld.

Reversed on petition; reversed and remanded for reconsideration on cross-petition.

---

[3] The ALJ found, with regard to Item 2-4:

"I conclude that the conduct in which foreman Anderson engaged in violating his own company's safety policy did constitute a willful violation. I find that Mr. Anderson did not have a 'good faith' misunderstanding of the company policy, and that he did not almost comply (substantial compliance) with company policy, therefore he is not entitled to any offset against the seriousness of his misconduct. He deliberately disregarded company policy without any mitigating circumstances, therefore, the penalty computation must be based upon the enhanced penalties contemplated by OAR 437-01-175."