[No. C032121. Third Dist. May 18, 2000.]

RICK'S ELECTRIC, INC., Plaintiff and Appellant, v.
CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH APPEALS
BOARD, Defendant and Respondent;
DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF
OCCUPATIONAL SAFETY AND HEALTH, Real Party in Interest and
Respondent.

1024

**COUNSEL**

Robert D. Peterson for Plaintiff and Appellant.

Robert H. Murray for Defendant and Respondent.

Michael D. Mason and Katherine R. Wolff for Real Party in Interest and Respondent.

## OPINION

**NICHOLSON, J.**—This appeal arises from a judgment affirming an administrative decision finding appellant willfully violated an occupational safety standard. Appellant claims it lacked the requisite state of mind to have committed a willful violation. We conclude substantial evidence supports the administrative decision and affirm.

### PROCEDURAL HISTORY

Real party in interest Department of Industrial Relations, Division of Occupational Safety and Health (Division), shoulders primary responsibility for administering and enforcing the California Occupational Safety and Health Act of 1973 (Cal/OSHA or the Act), Labor Code section 6300 et seq. It does this through investigating workplaces and enforcing occupational safety and health standards. (Lab. Code, §§ 6309, 6313, 6314.) Many of these standards, commonly referred to as safety orders, are codified at title 8 of the California Code of Regulations.[1]

Appellant Rick's Electric, Inc. (appellant) is a general electrical contractor. During December 1994 and January 1995, the Division issued three citations to appellant for violations of certain safety orders. Two citations, dated December 15, 1994, arose from work appellant performed at 4350 La Jolla Village Drive in San Diego. Appellant does not challenge either of these citations on this appeal. The second of these two citations, however, is relevant to the issues before us. That citation charged appellant with violating section 2320.2, subdivision (a), resulting in one of appellant's employees, James Serrano, receiving an electric shock and suffering injuries.[2] The citation designated this violation as "serious" and assessed a penalty in the amount of $4,000.[3]

The third citation, the only citation being litigated, arose from work appellant performed at 9855 Scranton Road in San Diego. This citation,

---

[1]All subsequent references to sections are to title 8 of the California Code of Regulations unless noted otherwise.

[2]Section 2320.2, subdivision (a), reads: "(a) Work shall not be performed on exposed energized parts of equipment or systems until the following conditions are met: [¶] (1) Responsible supervision has determined that the work is to be performed while the equipment or systems are energized. [¶] (2) Involved personnel have received instructions on the work techniques and hazards involved in working on energized equipment. [¶] (3) Suitable personal protective equipment has been provided and is used. Suitable insulated gloves shall be worn for voltages in excess of 300 volts, nominal. [¶] (4) Suitable eye protection has been provided and is used. [¶] (5) Where required, suitable barriers, barricades, tags, or signs are in place for personnel protection."

[3]Violations of the Act are classified either as regulatory, general, or serious, depending on the severity and character of the violation. (§ 334.) The classification determines the

dated January 5, 1995, charged appellant again with violating section 2320.2, subdivision (a), resulting in a different employee, John Blackstock, receiving an electric shock and suffering severe injuries. The citation designated this violation not only as serious, but also as willful. It assessed a penalty in the amount of $40,000.

Appellant appealed each of the citations to respondent California Occupational Safety and Health Appeals Board (Board). The Board is an independent adjudicatory agency responsible, among other matters, for resolving appeals from citations. (Lab. Code, § 148.) The Board consolidated appellant's appeals for hearing and decision. The matter was heard over two days of hearings conducted on March 27 and May 2, 1996, by Administrative Law Judge Ashaki A. Hesson.

By a decision dated August 26, 1996, Judge Hesson denied appellant's appeals in their entirety except on one point. Judge Hesson reversed the Division's determination that the Blackstock incident constituted a willful violation of section 2320, subdivision (a), and reduced the penalty on that citation to $4,000.

On September 23, 1996, the Board, on its own motion, ordered Judge Hesson's decision to be reconsidered by the Board. The Board limited its reconsideration to determining whether the evidence established the Blackstock incident constituted a willful violation of section 2320, subdivision (a). All other matters in Judge Hesson's decision were not reconsidered by the Board or challenged further by appellant, and are thus final and not before us.

On September 24, 1997, the Board reversed Judge Hesson's decision, concluding the Blackstock incident was a willful violation and reinstating the $40,000 penalty.

Appellant thereafter filed a petition for a writ of mandamus in the Sacramento County Superior Court, seeking an order directing the Board to set aside its decision. Following trial on January 8, 1999, the superior court denied the petition and entered judgment accordingly. Appellant timely appealed the judgment to us.

---

baseline civil penalty imposed for the violation (at the time of the incident, $5,000 for serious; $1,000 to $2,000 for general; and $500 for regulatory). (§ 336, subds. (a), (b), & (c)(1).) Any of these types of violations may also be classified as willful. (§ 334, subd. (e).) A finding of willfulness increases the proposed civil penalty for a serious violation by a factor of 10, up to a maximum of $70,000. (Lab. Code, § 6429; Cal. Code Regs., tit. 8, § 336, subd. (h).) (As will become apparent, the definition of a willful violation is the primary issue presented by this case.)

## FACTS

Testimony before Judge Hesson produced the following evidence: On December 1, 1994, John Blackstock was employed by appellant as a midlevel apprentice electrician. As a matter of policy, appellant prohibited apprentices from working on energized equipment. Blackstock thus had not been trained to work on energized equipment, nor was he provided that day with sufficient protective equipment necessary to work safely on energized equipment.

Blackstock and three other apprentices were working that day at 9855 Scratton Road, San Diego, under the supervision of Glen Woodmansee, a lead journeyman for appellant and a foreman on the project. The project involved installing electrical circuits in a vacant commercial building undergoing renovation. Woodmansee was in charge of wiring the building. He did not, though, personally install each foot of the approximately 10,000 to 15,000 feet of wiring he estimated had been installed in the building.

Woodmansee explained that on December 1, painters working in the building had requested lighting. He supplied them with extension cords for them to plug in their lighting. The power for these lights was 120-voltage temporary power from the building's electric room off of the "house panel," and was not a part of the tenant improvement portions of the building where appellant was working.

Woodmansee testified that by December 1, the renovation had advanced to its final stages. Woodmansee determined to test the newly installed electrical systems and light receptacles. The lighting in the building was divided into four distinct sections. A section was served by two lighting circuits supplying 277 volts of electricity each. Woodmansee intended to energize and test each circuit one at a time to determine which lights worked and which did not. To do this, he would power up the circuit, turn on a switch, identify the first light that did not work, turn off the switch, then, using a ladder, climb up into the ceiling to remedy the malfunctioning light, climb down the ladder, turn the switch back on, and so forth throughout the building. The 277-volt power was at that time also supplied off of the house panel.

Woodmansee instructed the four apprentices, including Blackstock, to work on other 120-volt circuits because there was no electricity supplied to those circuits that day. Woodmansee also told them not to work in the ceilings themselves, especially in the area where Woodmansee would be working.

Woodmansee began working in an area of the building designated for electrical purposes as section 1. Initially, Woodmansee intended Blackstock to work in the area where Woodmansee would be working. Woodmansee subsequently changed his mind, and directed Blackstock to another area of the building, so-called section 2, to work on three cables, or "tails" or "pigtails" as they were called. These cables were hanging down from the ceiling, not connected to any light fixture. Woodmansee directed Blackstock to strip the cables of their armor coating and insulation and tie them off in preparation for eventual connection to fixtures.

Woodmansee believed these three cables did not originate from section 1, where he was turning the lights on and off, but from section 2, where he had not turned on any power. The cables were run through the ceiling in a cable tray, and appeared to Woodmansee to be coming out of section 2 and laying over towards section 1. Woodmansee thus believed these cables were not energized with power. His belief was incorrect.

At some point after sending Blackstock to work on the cables, Woodmansee heard someone holler he had "a man down." Woodmansee ran and found Blackstock lying on the floor holding a cable in his hand. Woodmansee jumped onto the cable to pull it loose from Blackstock's hand. Woodmansee then administered cardiopulmonary resuscitation, rescue breathing and chest compressions to Blackstock until paramedics arrived.

The electric shock stopped Blackstock's heart and severely burned his hands, scalp and feet. He was revived and transported to the University of California, San Diego Medical Center where he remained for 16 days, spending his first five days there in a coma. He required two skin graft surgeries during that time, and another skin graft surgery approximately two months later. He also suffered short-term memory loss. Blackstock has no personal recall of the accident itself.

Between December 2, 1994, the day after the accident, and January 4, 1995, Melvin Dunn, an associate safety engineer with the Division, conducted an inspection at the accident site. On January 5, 1995, Dunn issued the citation, claiming Blackstock's accident occurred due to a violation of section 2320.2. The citation stated appellant "did not ensure that work on exposed energized equipment would not be performed until the following conditions [were] met: Responsible supervision has determined that the work is to be performed in an energized condition, involved personnel have received instructions on the work techniques and hazards involved in working on energized equipment, suitable personal protective equipment has been provided."

The citation provided the following detail: "On 12-01-94 employer had an employee working on a 277 volt energized electrical circuit [without] the above conditions being met. Company policy is that energized work will not be done, except in emergency conditions. Employee had not received instructions that the electrical circuit was to be energized while he performed work. Suitable personal protective equipment had not been provided by the employer."

During his investigation, Dunn interviewed Blackstock; Woodmansee; appellant's general superintendent, Daric Kleppe; and the owner of appellant, Rick Tieg. Dunn concluded Woodmansee arranged to provide power to painters working in the building by providing them a jumper line from the main building power supply. When Woodmansee connected this power, Dunn testified, it energized the portion of the building where Blackstock was working. When Blackstock stripped the cable on which he was working, he received a shock of 277 volts.

Although there was thus some dispute as to the source of the power which shocked Blackstock, there was no dispute that Blackstock received a shock of 277 volts. On rebuttal, Dunn stated Woodmansee during the inspection had talked about just the 277-volt equipment and that the lighting circuit on which Blackstock worked was 277 volts.

Woodmansee took Dunn to the electrical room that was supplying power. There, Dunn saw and photographed a main breaker for the building. The breaker was taped into the off position by means of duct tape. Dunn stated the duct tape would not have prevented anyone from physically being able to turn the circuit breaker on. Woodmansee clarified, however, that the breakers photographed by Dunn belonged to another contractor working on the site, and he had not placed the tape on those circuit breakers. Dunn agreed he did not testify the breaker or the duct tape belonged to appellant.

Dunn concluded appellant knew its actions constituted a violation. He based this conclusion in part on the fact that appellant had suffered a similar accident approximately three weeks earlier, the shock suffered by James Serrano.[4] During that investigation, Dunn had a conference with Kleppe and explained the seriousness of the Serrano incident as a violation of section

---

[4]On November 7, 1994, Serrano suffered a severe electrical shock while installing a 277-volt fluorescent light fixture in an overhead ceiling. The fixture was controlled by a three-way switch. Apparently, a switch unknown to the foreman was turned on while Serrano was working on the fixture. Like Blackstock, Serrano was only an apprentice electrician. Serrano had received no training on working with live circuits, and had no protective equipment with him when he performed this work. As with Blackstock's incident, Serrano's

2320.2, subdivision (a). Dunn stated he told Kleppe "all employees including and [*sic*] foremen should be trained and instructed right away on the policy and procedures to be followed when working with energized circuits, and if they were not going to work on an energized circuit in an energized state, they needed a better lock-out/tag-out program."

Dunn stated the occurrence of the Blackstock incident demonstrated appellant had not ensured its supervisors were thoroughly trained on procedures for ensuring circuits were not energized prior to commencing work on them.[5] Dunn also stated the Blackstock incident demonstrated appellant did not ensure supervisors properly determined whether work to be performed on energized equipment met the required conditions of section 2320.2, subdivision (a).

Because of this knowledge by appellant, Dunn determined appellant's violation was willful. Dunn believed appellant had learned the requirements of section 2320.2, subdivision (a), from the Serrano incident and Dunn's conference with appellant at that time. Also, Dunn claimed Woodmansee failed to inform employees that power had been turned on, failed to determine exactly what parts of the building would receive the power, and failed to inform employees they could possibly be working on energized equipment.

Dunn also testified there was a simple means to prevent the accident. In Dunn's opinion, Woodmansee could have tested the cables he assigned Blackstock to strip to see if those cables were energized. He stated there are numerous types of testers that could signal whether a circuit was energized.

Woodmansee, however, testified that before the accident, it would not have been normal procedure to test an area he did not believe was energized. Dunn disagreed, stating it was common practice to test, even after a circuit had been secured. Kleppe stated a tester, commonly called a "wiggy," was a tool required by appellant to be carried by all of appellant's employees.

---

foreman, Dave Burr, was not aware the circuit on which he had asked Serrano to work was energized. Burr had not tested the circuit to determine definitively whether the circuit was energized, nor had he performed what is called a "lock-out/tag-out," a procedure by which a circuit is turned off, locked, and tagged to ensure it is indeed off before someone begins working on it. In fact, Burr had not turned the circuit off so as to avoid disrupting the use of power by tenants working in the building.

[5]Kenneth Cohen, another Division investigator, testified that, unlike in the Serrano incident, a lock-out/tag-out would have been impossible for Woodmansee to do because of the testing Woodmansee was performing. Cohen believed keeping employees out of the ceiling would have prevented Blackstock's accident, and that Woodmansee knew or should have known where the circuits were and which would have been energized by his actions.

Kleppe said it was customary for appellant's employees to test for energized equipment if ever in doubt. However, Blackstock testified that prior to December 1, 1994, he had not received instructions from appellant to test all equipment and circuitry to determine if they were energized before working on them.

### Decisions Below

The Act itself does not define the term "willful," but an implementing regulation, subdivision (e) of section 334, defines a willful violation as "a *violation where evidence shows that the employer committed an intentional and knowing, as contrasted with inadvertent, violation, and the employer is conscious of the fact that what he is doing constitutes a violation of a safety law; or, even though the employer was not consciously violating a safety law, he was aware that an unsafe or hazardous condition existed and made no reasonable effort to eliminate the condition.*" (§ 334, subd. (e).)

Based on the evidence, Judge Hesson determined the violation was not willful: "Having cited the violation as willful, the Division has two alternate means of proving the willfulness of Employer's conduct under section 334(e). It could prove either that the Employer knew the provisions of Section 2320.2(a) and intentionally violated them, or, that the Employer knew 'that an unsafe or hazardous condition existed and made no reasonable effort to eliminate the condition.' [Citation.]

"Here, the record shows Woodmansee did not intentionally violate [section 2320.2, subdivision (a)] because he believed that he was the only one exposed to the hazard of working energized circuits on the day of the accident. It cannot be said that Employer 'made no reasonable effort to eliminate the condition.' Actually, the record does show some reasonable efforts—sending Blackstock ahead to work in the space erroneously thought to be de-energized by Woodmansee to eliminate the hazardous condition." (Underscoring in original.)

On its reconsideration of this decision, the Board disagreed with Judge Hesson's analysis, finding the evidence established appellant both knowingly violated section 2320.2, subdivision (a), and knew of the hazardous condition but failed to attempt to correct it. As to the first test, the Board concluded appellant knew from the investigation and conference following the Serrano incident of the legal requirement to train and provide protective gear for its employees before they worked on energized circuits, but disregarded those requirements here.

The Board also relied upon section 2320.3 as a basis for its decision. That regulation reads: "All electrical equipment and systems shall be treated as

energized as required by Section 2320.2 until tested or otherwise proven to be deenergized." The Board concluded Woodmansee's belief that the circuit was not energized did not meet the requirements of section 2320.3, which required him to assume and treat the circuit as energized until tested or proven otherwise. The fact that Woodmansee did not personally know where all of the 15,000 feet of wiring went in the building demonstrated that his belief based on visual observation was insufficient to serve as proof the circuit was deenergized. Woodmansee's decision to direct Blackstock to work on the cables without adequate training or equipment, and without testing the circuit or otherwise proving it was not energized, demonstrated in light of the Serrano incident appellant's knowledge of section 2320.2 and its intentional violation of that safety order.

As to the second test, the Board determined Woodmansee exposed Blackstock to a hazardous condition by directing him to work on the cables without first testing to see if they were energized. Woodmansee did nothing to correct that hazard. Further, both the Serrano and Blackstock incidents demonstrated appellant failed to attempt to provide adequate precautions to prevent its employees from coming into contact with energized circuits.

The trial court thereafter denied appellant's petition for a writ of mandamus and affirmed the Board's decision without filing a statement of decision.

DISCUSSION

I

*Standard of Review*

"Our function on appeal is the same as that of the trial court in ruling on the petition for the writ. We must determine whether based on the entire record the Board's decision is supported by substantial evidence and whether it is reasonable. (Lab. Code, § 6629; *Davey Tree Surgery Co.* v. *Occupational Safety & Health Appeals Bd.* (1985) 167 Cal.App.3d 1232, 1240 [213 Cal.Rptr. 806].) Where the decision involves the interpretation and application of existing regulations, we must determine whether the administrative agency applied the proper legal standard. (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161].) Since the interpretation of a regulation is a question of law, while the administrative agency's interpretation is entitled to great weight, the ultimate resolution of the legal question rests with the courts. . . . An agency's expertise with regard to a statute or regulation it is charged with enforcing

entitles its interpretation of the statute or regulation to be given great weight unless it is clearly erroneous or unauthorized. [Citations.] The Board is one of those agencies whose expertise we must respect. [Citation.]" (*Lusardi Construction Co. v. California Occupational Safety & Health Appeals Bd.* (1991) 1 Cal.App.4th 639, 643, 645 [2 Cal.Rptr.2d 297].) However, "[a]n administrative agency cannot alter or enlarge the legislation, and an erroneous administrative construction does not govern the court's interpretation of the statute." (*Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 526 [63 Cal.Rptr.2d 118].)

II

*"Willful" Violation*

Appellant claims this case presents an issue of first impression, and indeed it may. We have found no other reported decision interpreting or applying the definition of a "willful" violation of safety standards promulgated under Cal/OSHA.

██ Section 334 establishes two alternate tests for determining whether a violation is willful. The first test requires the Division to prove "the employer committed an intentional and knowing, as contrasted with inadvertent, violation, and the employer is conscious of the fact that what he is doing constitutes a violation of a safety law . . . ." (§ 334, subd. (e).) The second and alternate test requires the Division to prove the employer, even though "not consciously violating a safety law, . . . was aware that an unsafe or hazardous condition existed and made no reasonable effort to eliminate the condition." (*Ibid.*)

The Board interprets section 334 as follows: "Under Section 334, the Division may establish the willfulness of a violation by showing by a preponderance of the evidence that: (1) an employer intentionally violated a safety law; or (2) an employer had actual knowledge of an unsafe or hazardous condition, yet did not attempt to correct it. [Citation.] Both tests require the Division to prove that the employer had a particular state of mind. Under the first, the Division must prove that the employer intentionally violated a worker safety law. This is often shown by evidence of an earlier Division inspection where the violation was discussed or evidence of a previous injury involving similar circumstances. [Citation.] [¶] The second test requires a showing that the employer was cognizant of a hazardous condition, but did nothing to correct it. [Citation.]" (*In the Matter of the Appeal of National Cement Co., Employer* (CALOSHA, Mar. 10, 1993) OSHAB 91-R5D2-310 [1993 WL 369150], decision after reconsideration.)

Appellant argues the Board applies the wrong standard for determining willfulness. Appellant claims section 334 "requires proof of a subjective state of mind; proof that an employer consciously committed an intentional and knowing violation of a safety regulation or that the employer was aware of the existence of an unsafe condition and permitted an employee to be exposed to the unsafe conditions by not making a reasonable effort to correct the unsafe condition. . . . Under either test, it is not merely a knowing violation of a safety order which triggers a 'willful' classification of a violation, but the subjective state of mind of the employer; an intent that by allowing (or not prohibiting) certain actions by an employee, that employee will be exposed to a hazardous condition."

The Board and the Division disagree, claiming appellant formulates an overly stringent interpretation of section 334. The Board admits its precedents require a showing of a "particular state of mind" to establish a willful violation under either of the two tests. However, the Board claims this state of mind "is no more than a conscious awareness of either the safety law violated or of a dangerous condition. To this extent, and only to this extent, does the test turn on the employer's subjective state of mind. . . . [Furthermore,] Respondent Board may infer the employer's subjective state of mind from the facts and circumstances of the case, and is not limited to the Employer's admissions of its subjective state of mind." (Underscoring in original.)

For the reasons that follow, we conclude the Board determined appellant's violation was willful under an appropriate standard, and substantial evidence supports the Board's determination. We discuss appellant's arguments under each of the two willfulness tests.

## A. *First Test: Intent and Knowledge*

Appellant argues the Division had to prove appellant consciously committed an intentional and knowing violation of a safety order. In other words, appellant claims the Division had to show appellant intentionally assigned Blackstock to work without training or protection on cables appellant knew were energized, and that appellant knew this assignment would violate section 2320.2 and place Blackstock in harm's way. We disagree.

Years ago, the United States Supreme Court stated willfulness in the context of a regulatory statute imposing civil penalties does not imply a showing of evil purpose. Rather, the term "often denotes that which is 'intentional, or knowing, or voluntary, as distinguished from accidental,' and that it is employed to characterize 'conduct marked by careless disregard

whether or not one has the right so to act.' . . . But it does not mean with intent to injure . . . or to inflict loss . . . because such intent on the part of [the actor] is hardly within the pale of actual experience or reasonable supposition. . . . [W]e are persuaded that it means purposely or obstinately and is designed to describe the attitude of a[n] [actor], who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements." (*U.S. v. Illinois Cent. R. Co.* (1937) 303 U.S. 239, 242-243 [58 S.Ct. 533, 535, 82 L.Ed. 773, 777].)

Cal/OSHA's federal counterpart, the Occupational Safety and Health Act of 1970, 29 United States Code section 651 et seq., also imposes penalties for willful violations without defining the term "willful." A majority of the federal courts of appeals, including the Ninth Circuit, have interpreted the term "willful" in that statute consistent with the Supreme Court's interpretation in *Illinois Cent. R. Co.* Hence, " ' "willful" means action taken knowledgeably by one subject to the statutory provisions in disregard of the action's legality. No showing of malicious intent is necessary. A conscious, intentional, deliberate, voluntary decision properly is described as willful, "regardless of venial motive." [Citation.]' " (*Nat. Steel, etc. v. Occupational S. & H. R. Com'n* (9th Cir. 1979) 607 F.2d 311, 314-315, quoting *Intercounty Const. Co. v. Occupational S. & H. R. Com'n* (4th Cir. 1975) 522 F.2d 777, 779-780 (hereafter, *Intercounty Construction Co.*).)[6]

The federal courts reasoned "[t]o require bad intent would place a severe restriction on the statutory authority of OSHA to apply the stronger sanctions in enforcing the law, a result we do not feel was intended by Congress. Rather, we agree with the Commission that willfulness is used in the mere cognitive sense in civil statutes, and connotes bad purpose only when an element of a criminal act." (*Intercounty Construction Co., supra,* 522 F.2d at p. 780.)

[6]Other federal cases reaching the same conclusion include *F. X. Messina Const. Corp. v. Occupational S. & H. R. C.* (1st Cir. 1974) 505 F.2d 701; *A. Schonbek & Co., Inc. v. Donovan* (2d Cir. 1981) 646 F.2d 799; *Georgia Elec. Co. v. Marshall* (5th Cir. 1979) 595 F.2d 309; *Empire-Detroit Steel v. Occupational Safety, etc.* (6th Cir. 1978) 579 F.2d 378; *Western Waterproofing Co., Inc. v. Marshall* (8th Cir. 1978) 576 F.2d 139, cert. den. (1978) 439 U.S. 965 [99 S.Ct. 452, 58 L.Ed.2d 423]; and *Kent Nowlin Const. v. Occupational Safety and Health* (10th Cir. 1979) 593 F.2d 368. The Third Circuit has imposed a more stringent definition, and the District of Columbia Circuit has refused to side with either position. (See *Frank Irey, Jr., Inc. v. Occupational Safety & H. R. Com'n* (3d Cir. 1975) 519 F.2d 1200, affd. on other grounds (1977) 430 U.S. 442 [97 S.Ct. 1261, 51 L.Ed.2d 464]; *Cedar Const. Co. v. Occupational Safety and Health* (D.C. Cir. 1978) 587 F.2d 1303 [190 App.D.C. 406].) The few state court cases reporting on this issue involve states that have adopted either the federal statute or the federal standard of willfulness, and each follow the Ninth Circuit's interpretation. (See *OR-OSHA v. Roseburg Lumber Co.* (1997) 151 Or.App. 236 [949 P.2d 307]; *Northwest Metal Fab & Pipe, Inc. v. State Dept. of Labor & Industries* (1996) 84 Wn.App. 1018; *Div. of OSHC v. Ball, Ball & Brosamer* (1992) 172 Ariz. 372 [837 P.2d 174].)

The reasoning of these federal cases applies equally well to the use of the term "willful" in Cal/OSHA. It will rarely be the case that an employer actually intends to put an employee in harm's way. If an employer did so, it would likely be subject to criminal sanction. (See, e.g., Lab. Code, § 6423; Penal Code, § 387.) Because "willfulness" in the context of Cal/OSHA serves as a basis for calculating a civil penalty, there is no need to imply a showing of criminal mens rea as a required element.

Not requiring a showing of actual intent to do harm also furthers the Legislature's intent to vest the Division with broad enforcement power, including the authority to impose higher penalties. (Lab. Code, §§ 6300, 6307, 6308.) Indeed, we are required to give the Act a liberal interpretation for purposes of promoting a safe working environment for all working Californians. (*Carmona v. Division of Industrial Safety, supra,* 13 Cal.3d at pp. 312-313.)

Furthermore, the Board in interpreting section 334 has consistently not required a showing of actual intent and knowledge to do harm to support classifying a violation as willful. (See, e.g., *In the Matter of the Appeal of PCL Civil Constructors, Inc., Employer,* OSHAB 93-R3D2-2373, Decision After Reconsideration (Mar. 4, 1999) [1999 WL 199458]; *In the Matter of the Appeal of MCM Construction, Inc. Employer,* OSHAB 92-R2D3-436, Decision After Reconsideration (May 23, 1995) [1995 WL 317086].) Since the Board's interpretation of section 334 is not clearly erroneous or unauthorized, we are obligated to give it great weight.

Appellant argues not requiring a showing of actual intent and knowledge to harm merely duplicates the standard required by the Act for establishing a "serious violation." We disagree.[7] To justify classifying a violation as serious, the Division does not have to prove employer consciousness or knowledge of the safety order the employer is violating or the facts constituting the violation. (Lab. Code, § 6432.) The Division must make such a showing to support classifying a violation as willful.

For these reasons, we conclude the Board applied an appropriate standard of intent in this matter. That standard requires the Division to prove by a preponderance of the evidence that the employer committed a voluntary and volitional, as opposed to inadvertent, act, or, in other words, that the act itself was the desired consequence of the actor's intent, and that the employer was conscious that its act violated a safety order.

---

[7]In general, a serious violation occurs when "there is a substantial probability that death or serious physical harm could result from a violation" unless "the employer can demonstrate that it did not, *and could not* with the exercise of reasonable diligence, know of the presence of the violation." (Lab. Code, § 6432, subds. (a), (b), italics added.)

■ Substantial evidence supports the Board's conclusions that appellant committed a willful violation under this first test of section 334. No one disputes Woodmansee intentionally directed Blackstock to work on the cables. Blackstock's injury arose from Woodmansee's specific, voluntary, and intentional direction to do the work that led to the injury. This is a sufficient showing of intent for purposes of section 334.

Regarding the element of knowledge, appellant conceded at trial it had knowledge of section 2320.2, and also conceded Blackstock's work on energized cables without protective equipment and prior training violated section 2320.2. However, appellant claims in effect it could not have known Woodmansee's directing Blackstock to work on the cables would violate a safety order because Woodmansee did not know the cables were in fact energized.

The Division, however, presented evidence demonstrating the employer had not just constructive knowledge, but actual knowledge of the Division's safety orders requiring appellant to treat all electrical equipment, such as the cables, as energized until tested or proven otherwise (see § 2320.3), and requiring appellant to assign only properly trained and adequately equipped personnel to work on energized cables (see § 2320.2). This evidence consisted of the information given to appellant by Dunn following the Serrano incident.

Thus, no matter what Woodmansee may have subjectively and in good faith believed about the status of the cables, appellant knew that whenever it came upon an electrical cable, it had to take one of two actions before commencing any work on that cable: either test the cable to see if it was in fact energized, or ensure the person working on the cable had sufficient training and protective equipment before starting the work. Woodmansee took neither of these actions. Instead, he assigned an untrained and unprotected employee to work on a cable the evidence demonstrated he knew he was to treat as energized. That assignment was thus a clear violation of section 2320.2, and Woodmansee's knowledge that his directive violated section 2320.2 can be inferred from the evidence. (Evid. Code, § 600, subd. (b).)

Based on the above, we conclude substantial evidence supports the Board's conclusion that appellant committed an intentional violation and was conscious at the time that its act would violate a safety order.

B.  *Second Test: Awareness and Elimination of Hazard*

Under section 334's second test, appellant commits a willful violation when it is aware of a hazardous condition but fails to make reasonable efforts to remove the condition. Appellant argues the Division had to prove appellant was actually aware Blackstock was being exposed to energized cables. Appellant claims Woodmansee was not aware there was an actual hazard, and in fact Woodmansee directed Blackstock to work on the cables in order to remove Blackstock from a hazardous condition. We disagree with appellant's formulation of this test.

As already shown, the Board had before it substantial evidence demonstrating appellant had actual knowledge of its requirement to treat the dangling cables as energized, i.e., hazardous. Appellant knew working on an energized line created a hazard. At trial, appellant agreed it was common sense to assume electrical equipment such as the cables were energized until proven otherwise. This evidence constituted substantial evidence demonstrating appellant was aware of the hazardous condition presented by the cables on which Blackstock was directed to work. Appellant did not need to know the cables were actually energized in order to recognize they presented a hazardous condition.

The other element of the second test is a showing that appellant made a reasonable effort to eliminate that hazard. Appellant notes Woodmansee directed Blackstock to work on the cables in order to eliminate a hazardous condition. That may be so, but the hazard at issue was not Woodmansee's work; it was the cables on which Woodmansee directed Blackstock to work. As already explained, Woodmansee directed Blackstock to work on those cables without taking any action to eliminate the hazardous condition they presented.

The evidence demonstrated the hazard could have been rendered safe simply by use of a tester, which all appellant's employees were required to carry on their person. Woodmansee could have tested the cable. Or, realizing the cable was not tested, he could have complied with sections 2320.2 and 2320.3, assumed the cable was energized, and not have assigned Blackstock to work on them. Woodmansee took none of these steps. Substantial evidence thus supports the Board's determination that appellant was aware of the hazardous condition but failed to take any reasonable efforts to eliminate the condition.

## DISPOSITION

For all of the above reasons, the judgment of the trial court is affirmed. The Board and the Division are awarded their costs on appeal.

Sims, Acting P. J., and Hull, J., concurred.